IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

OCT 3 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Department of Justice, Antitrust Division<br>1401 H Street, N.W., Suite 8000<br>Washington, D.C. 20530,<br><br>*Plaintiff*,<br><br>v.<br><br>AT&T INC.<br>175 East Houston<br>San Antonio, Texas 78205<br><br>and<br><br>DOBSON COMMUNICATIONS<br>   CORPORATION<br>14201 Wireless Way<br>Oklahoma City, Oklahoma 73134,<br><br>*Defendants*. | Case: 1:07-cv-01952<br>Assigned To : Collyer, Rosemary M.<br>Assign. Date : 10/30/2007<br>Description: Antitrust |

# COMPLAINT

The United States of America, acting under the direction of the Acting Attorney General of the United States, brings this civil action to enjoin the merger of two mobile wireless telecommunications service providers, AT&T Inc. ("AT&T") and Dobson Communications Corporation ("Dobson"), and to obtain other relief as appropriate. Plaintiff United States alleges as follows:

1.  AT&T entered into an agreement to acquire Dobson, dated June 29, 2007, under which the two companies would combine their mobile wireless telecommunications services businesses ("Transaction Agreement") and AT&T would acquire the Cellular One brand name

and associated rights. The United States seeks to enjoin this transaction because it likely will substantially lessen competition to provide mobile wireless telecommunications services in several geographic markets where AT&T and Dobson are each other's most significant competitor or where AT&T competes against mobile wireless telecommunications services providers that sell services under the Cellular One brand name.

2.  AT&T provides mobile wireless telecommunications services in 50 states and serves in excess of 63 million subscribers. Dobson provides mobile wireless telecommunications services in seventeen states and serves approximately 1.6 million subscribers. The combination of AT&T and Dobson likely will substantially lessen competition for mobile wireless telecommunications services in five geographic areas in Kentucky, Missouri, Oklahoma and Texas where businesses owned in whole or part by AT&T and Dobson currently operate. As a result of the proposed acquisition, residents of these mostly rural areas will likely face increased prices, diminished quality or quantity of services, and less investment in network improvements for these services. Additionally, in two relevant geographic areas in Pennsylvania and Texas, competition likely will be substantially lessened to the detriment of consumers because AT&T will have the incentive and ability to limit, or eliminate, a primary competitor's right to use the Cellular One brand name effectively.

## I. JURISDICTION AND VENUE

3.  This Complaint is filed by the United States under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain defendants from violating Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

Case 1:07-cv-01952-ESH    Document 1    Filed 10/30/2007    Page 3 of 16

4.  AT&T and Dobson are engaged in interstate commerce and in activities substantially affecting interstate commerce. The Court has jurisdiction over this action pursuant to Sections 15 and 16 of the Clayton Act, 15 U.S.C. §§ 25, 26, and 28 U.S.C. §§ 1331, 1337.

5.  The defendants have consented to personal jurisdiction and venue in this judicial district.

## II. THE DEFENDANTS AND THE TRANSACTION

6.  AT&T, with headquarters in San Antonio, Texas, is a corporation organized and existing under the laws of the state of Delaware. AT&T is the largest communications holding company in the United States and worldwide, measured by revenue. AT&T is the largest mobile wireless telecommunications services provider in the United States, measured by subscribers, provides mobile wireless telecommunications services in 50 states, and serves in excess of 63 million subscribers. In 2006, AT&T earned mobile wireless telecommunications services revenues of approximately $37.53 billion.

7.  Dobson, with headquarters in Oklahoma City, Oklahoma, is a corporation organized and existing under the laws of the state of Oklahoma. Dobson is the ninth largest mobile wireless telecommunications services provider in the United States, measured by subscribers and provides mobile wireless telecommunications services in 17 states. It has approximately 1.7 million subscribers. Dobson also owns Cellular One Properties, LLC, an Oklahoma limited liability company, engaged in the business of licensing the Cellular One brand and promoting the Cellular One service mark and certain related trademarks, service marks and designs. In 2006, Dobson earned approximately $1.3 billion in revenues.

8. Pursuant to an Agreement and Plan of Merger dated June 29, 2007, AT&T will acquire Dobson for approximately $2.8 billion. If this transaction is consummated, AT&T and Dobson combined would have approximately 65 million subscribers in the United States, with $37.54 billion in mobile wireless telecommunications services revenues.

### III. TRADE AND COMMERCE

#### A. Nature of Trade and Commerce

9. Mobile wireless telecommunications services allow customers to make and receive telephone calls and obtain data services using radio transmissions without being confined to a small area during the call or data session, and without the need for unobstructed line-of-sight to the radio tower. Mobility is highly valued by customers, as demonstrated by the more than 233 million people in the United States who own mobile wireless telephones. In 2006, revenues from the sale of mobile wireless telecommunications services in the United States were over $125 billion. To meet this desire for mobility, mobile wireless telecommunications services providers must deploy extensive networks of switches and radio transmitters and receivers and interconnect their networks with the networks of wireline carriers and other mobile wireless telecommunications services providers.

10. The first mobile wireless voice systems were based on analog technology, now referred to as first-generation or "1G" technology. These analog systems were launched after the Federal Communications Commission ("FCC") issued the first spectrum licenses for mobile wireless telecommunications services. In the early to mid-1980s, the FCC issued two cellular licenses (A-block and B-block) in each Metropolitan Statistical Area ("MSA") and Rural Service Area ("RSA") (collectively, "Cellular Marketing Areas" or "CMAs"), with a total of 734 CMAs

covering the entire United States. Each license consists of 25 MHz of spectrum in the 800 MHz band.

11. In 1995, the FCC licensed additional spectrum for the provision of Personal Communications Services ("PCS"), a category of services that includes mobile wireless telecommunications services comparable to those offered by cellular licensees. These licenses are in the 1900 MHz band and are divided into six blocks: A, B, and C, which consist of 30 MHz each; and D, E, and F, which consist of 10 MHz each. Geographically, the A and B-block 30 MHz licenses are issued by Major Trading Areas ("MTAs"). C, D, E, and F-block licenses are issued by Basic Trading Areas ("BTAs"), several of which comprise each MTA. MTAs and BTAs do not generally correspond to MSAs and RSAs.

12. With the introduction of the PCS licenses, both cellular and PCS licensees began offering digital services, thereby increasing network capacity, shrinking handsets, and extending battery life. In addition, in 1996, one provider, a specialized mobile radio ("SMR" or "dispatch") spectrum licensee, began to use its SMR spectrum to offer mobile wireless telecommunications services comparable to those offered by other mobile wireless telecommunications services providers, in conjunction with its dispatch, or "push-to-talk," service. Although there are a number of providers holding spectrum licenses in each area of the country, not all providers have fully built out their networks throughout each license area. In particular, because of the characteristics of PCS spectrum, providers holding this type of spectrum have found it less attractive to build out in rural areas.

13. Today, more than 98 percent of the total U.S. population lives in counties where three or more mobile wireless telecommunications services operators offer digital service.

Nearly all mobile wireless voice service has migrated to second-generation or "2G" digital technologies, GSM (global standard for mobility, a standard used by all carriers in Europe), and CDMA (code division multiple access). Even more advanced technologies ("2.5G" and "3G"), based on the earlier 2G technologies, have been deployed for mobile wireless data services.

### B. Relevant Product Market

14. Mobile wireless telecommunications services is a relevant product market. Mobile wireless telecommunications services include both voice and data services provided over a radio network and allow customers to maintain their telephone calls or data sessions without wires, such as when traveling. There are no cost-effective alternatives to mobile wireless telecommunications services. Because fixed wireless services are not mobile, they are not regarded by consumers of mobile wireless telecommunications services to be a reasonable substitute for those services. It is unlikely that a sufficient number of customers would switch away from mobile wireless telecommunications services to make a small but significant price increase in those services unprofitable. Mobile wireless telecommunications services accordingly is a relevant product market under Section 7 of the Clayton Act, 15 U.S.C. § 18.

### C. Relevant Geographic Markets

15. A large majority of customers use mobile wireless telecommunications services in close proximity to their workplaces and homes. Thus, customers purchasing mobile wireless telecommunications services choose among mobile wireless telecommunications services providers that offer services where they live, work, and travel on a regular basis. The number and identity of mobile wireless telecommunications services providers varies among geographic areas, as does the quality of services and breadth of geographic coverage offered by providers.

Mobile wireless telecommunications services providers can and do offer different promotions, discounts, calling plans, and equipment subsidies in different geographic areas, varying the price for customers by geographic area.

16. The United States comprises numerous local geographic markets for mobile wireless telecommunications services. The geographic areas in which the FCC has licensed mobile wireless telecommunications services providers often represent the core geographic areas in which an individual consumer would use mobile wireless telecommunications services, those being the areas in which an individual customer resides, works and plays. The relevant geographic markets in which this transaction will substantially lessen competition in mobile wireless telecommunications services are effectively represented, but not defined, by FCC spectrum licensing areas.

17. The relevant geographic markets, under Section 7 of the Clayton Act, 15 U.S.C. §18, where the transaction will substantially lessen competition for mobile wireless telecommunications services are represented by the following FCC spectrum licensing areas: Kentucky RSA-6 (CMA 448); Kentucky RSA-8 (CMA 450); Missouri RSA-1 (CMA 504); Oklahoma RSA-5 (CMA 600); Pennsylvania RSA-5 (CMA 616); Texas RSA-9 (CMA 660); and Texas RSA-11 (CMA 662). It is unlikely that a sufficient number of customers would switch to mobile wireless telecommunications services providers in a different geographic market to make a small but significant price increase in the relevant geographic markets unprofitable.

### D. Anticompetitive Effects

#### 1. Overlap Areas

##### a. AT&T/Dobson Overlap Markets

17. Currently, AT&T and Dobson each own a business that offers mobile wireless telecommunications services in three relevant geographic areas: Kentucky RSA-6 (CMA 448); Kentucky RSA-8 (CMA 450); and Oklahoma RSA-5 (CMA 600).

18. In each of these three relevant geographic areas, either AT&T or Dobson has the largest share of subscribers and the other defendant is a particularly strong and important competitor: the companies controlled by AT&T and Dobson collectively account for between 63 percent and 97 percent of subscribers in these areas. As measured by the Herfindahl-Hirschman Index ("HHI"), which is commonly employed in merger analysis and is defined and explained in Appendix A to this Complaint, concentration in these markets ranges from over 3100 to more than 7900, which is well above the 1800 threshold at which the Department considers a market to be highly concentrated. After AT&T's proposed acquisition of Dobson is consummated, the HHIs in the relevant geographic markets will range from over 5200 to over 9400, with increases in the HHI as a result of the merger ranging from over 1400 to over 2300, significantly beyond the thresholds at which the Department considers a transaction likely to cause competitive harm.

##### b. AT&T Minority Interest Markets

20. In two relevant geographic areas, Missouri RSA-1 (CMA 504) and Texas RSA-9 (CMA 660), Dobson owns a business that offers mobile wireless telecommunications services and AT&T has a minority interest in a competing business. In Missouri RSA-1, AT&T's

minority equity interest is in Northwest Missouri Cellular Limited Partnership's business and in Texas RSA-9, AT&T's minority equity interest is in Mid-Tex Cellular, Ltd.

21. In these two relevant geographic areas, either Dobson or the business in which AT&T has a minority interest has the largest share and the other defendant is a particularly strong and important competitor in all, or a large part, of the RSA. In each area, the businesses in which AT&T and Dobson have an interest collectively account for in excess of 70 percent of subscribers.

22. Although the minority equity interest in each situation is small, AT&T has significant rights under the relevant partnership agreements to control core business decisions, obtain critical confidential competitive information, and share in profits at a rate significantly greater than the equity ownership share upon a sale of the partnership. Post-merger, the merged firm would likely have the ability and incentive to coordinate the activities of the wholly-owned Dobson wireless business and the business in which it has a minority stake, and/or undermine the ability of the latter to compete against the former. Such activity would likely result in a significant lessening of competition.

### c.     AT&T/Cellular One Overlap Markets

23. In two relevant geographic areas, Pennsylvania RSA-5 (CMA 616) and Texas RSA-11 (CMA 662), AT&T owns a business that offers mobile wireless telecommunications services, and a competing mobile wireless telecommunications business operates under the Cellular One brand name that AT&T would acquire from Dobson pursuant to the proposed transaction.

24. In these two relevant geographic areas, AT&T has the largest share of subscribers and the mobile wireless telecommunications business operating under the Cellular One brand name is a particularly strong and important competitor. In each area, AT&T and the Cellular One licensee collectively account for in excess of 65 percent of subscribers.

25. The Cellular One brand name was first used in 1984. In 1989, the Cellular One Group partnership was formed to maintain and promote the Cellular One brand, a licensed trade name. In 1995, the partnership offered to license the brand to all A block cellular providers. Presently, approximately nine mobile wireless telecommunications services providers in addition to Dobson license the Cellular One brand and offer services to their customers under that brand. Through its planned purchase of Dobson, AT&T will acquire the rights to the Cellular One trademarks, trade names, service marks, service names, and designs for the Cellular One brand name, as well as the agreements to license the Cellular One brand to other mobile wireless telecommunications services providers.

26. The providers that continue to license and use the Cellular One brand have invested considerable resources in developing and building the brand. The Cellular One brand is thus an important input to these firms' provision of mobile wireless telecommunications services. If their ability to use the brand were to be impaired or eliminated, they would suffer considerable costs and effective competition in these markets would be harmed.

27. Because AT&T offers and markets wireless services under its own AT&T brand, it has little or no incentive to use or maintain the Cellular One brand. In the two relevant geographic areas where a Cellular One licensee is a primary competitor to AT&T in the mobile wireless telecommunications services market, AT&T would have the incentive and ability to

impair the effectiveness of the Cellular One brand, or even deny a license to the current licensee entirely, since by doing so, it could reduce competition by significantly increasing costs to a primary competitor at little or no cost to itself.

### 2. Competitive Impact

28. In all seven relevant geographic markets, the mobile wireless telecommunications businesses wholly or partially owned by AT&T and Dobson, and/or the Cellular One licensee, own all or most of the 800 MHz band cellular spectrum licenses, which are more efficient in serving rural areas than 1900 MHz band PCS spectrum. As a result of holding the cellular spectrum licenses and being early entrants into these markets, the networks wholly or partly owned by AT&T, Dobson, or the Cellular One licensee provide greater depth and breadth of coverage than their competitors, which are operating on PCS spectrum in these relevant geographic markets, and thus are more attractive to consumers. A mobile wireless telecommunications services provider with limited coverage in a geographic area typically does not aggressively market its services in that area because it can service customers only through a roaming arrangement with a more built-out competitor under which it must pay roaming charges to, and rely on, its competitor to maintain the quality of the network. The mobile wireless businesses wholly or partly owned by AT&T or Dobson in five of the relevant areas, and by AT&T and the Cellular One licensee in the other two relevant areas, accordingly, are, for a large set of customers, likely closer substitutes for each other than the other mobile wireless telecommunications services in these markets provided by firms who own only PCS spectrum.

29. Competition between the businesses wholly or partly owned by AT&T and Dobson, or between AT&T and the Cellular One licensee, in the relevant geographic markets has

resulted in lower prices and higher quality in mobile wireless telecommunications services, than would otherwise have existed in these geographic markets. In these areas, many consumers consider businesses wholly or partly owned by AT&T, Dobson, or the Cellular One licensee to be the most attractive competitors because other providers' networks lack coverage or provide lower-quality service.

30.     If AT&T's proposed acquisition of Dobson is consummated, (a) the relevant market for mobile wireless telecommunications services will become substantially more concentrated in the three AT&T/Dobson overlap geographic markets, and competition between AT&T and Dobson in mobile wireless telecommunications services will be eliminated in these markets; (b) competition in mobile wireless telecommunications services between Dobson and the businesses partly owned by AT&T will be substantially curtailed in the two AT&T minority ownership geographic markets, and (c) AT&T's acquisition of the rights to the Cellular One brand is likely to diminish the Cellular One licensees' ability to competitively constrain AT&T in the two AT&T/Cellular One overlap geographic markets thereby lessening competition substantially to the detriment of consumers. In all seven relevant geographic areas, the merged firm will have the incentive and ability to increase prices, diminish the quality or quantity of services provided, and refrain from or delay making investments in network improvements.

### 3.     Entry

31.     Entry by a new mobile wireless telecommunications services provider in the relevant geographic markets would be difficult, time-consuming, and expensive, requiring the acquisition of spectrum licenses and the build-out of a network. Although a number of other firms own 1900 MHz PCS spectrum in the relevant geographic markets, the propagation

characteristics of 1900 MHz PCS spectrum are such that signals using those frequencies extend to a significantly smaller area than 800 MHz cellular signals. The relatively higher cost of building out 1900 MHz spectrum, combined with the relatively low population density of the areas in question, suggest that competitors with 1900 MHz spectrum are unlikely to build out their networks to reach the entire area served by AT&T and Dobson. Although additional spectrum has been and will be made available through FCC auctions, it is unlikely that additional mobile wireless telecommunications services based on this spectrum will be deployed in the near future in the relevant geographic areas. Therefore, new entry in response to a small but significant price increase for mobile wireless telecommunications services by the merged firm in the relevant geographic markets would not be timely, likely, or sufficient to thwart the competitive harm resulting from AT&T's proposed acquisition of Dobson, if it were to be consummated.

## IV. VIOLATION ALLEGED

32.     The effect of AT&T's proposed acquisition of Dobson, if it were to be consummated, may be substantially to lessen competition in interstate trade and commerce in the relevant geographic markets for mobile wireless telecommunications services, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

33.     Unless restrained, the transaction will likely have the following effects in mobile wireless telecommunications services in the relevant geographic markets, among others:

    a.     actual and potential competition between AT&T and Dobson will be eliminated;

    b.    actual and potential competition between Dobson and businesses in which AT&T holds a minority interest will be lessened;

    c.    actual and potential competition between AT&T and Cellular One brand licensees will be lessened;

    d.    competition in general will be lessened substantially;

    e.    prices are likely to increase;

    f    the quality and quantity of services are likely to decrease; and

    g.    incentives to improve wireless networks will be reduced.

## V. REQUESTED RELIEF

The United States requests:

34. That AT&T's proposed acquisition of Dobson be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

35. That defendants be permanently enjoined from and restrained from carrying out the Agreement and Plan of Merger dated June 29, 2007, or from entering into or carrying out any agreement, understanding, or plan, the effect of which would be to bring the wireless services businesses of AT&T and Dobson under common ownership or control;

36. That the United States be awarded its costs of this action; and

37. That the United States have such other relief as the Court may deem just and proper.

Dated: October 30, 2007

Respectfully Submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

_____
Thomas O. Barnett
Assistant Attorney General
Antitrust Division

_____
Deborah A. Garza
Deputy Assistant Attorney General
Antitrust Division

_____
J. Robert Kramer II
Director of Operations
Antitrust Division

_____
Nancy Goodman
Chief, Telecommunications & Media
Enforcement Section
Antitrust Division

_____
Laury Bobbish
Assistant Chief, Telecommunications &
Media Enforcement Section
Antitrust Division

_____
Hillary B. Burchuk (DC Bar No. 366755)
Lawrence M. Frankel (DC Bar No. 441532)
Rebekah P. Goodheart (DC Bar No. 472673)

Attorneys, Telecommunications & Media
Enforcement Section
Antitrust Division
U.S. Department of Justice
City Center Building
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530
Phone: (202) 514-5621
Facsimile: (202) 514-6381

15

# APPENDIX A

## Herfindahl-Hirschman Index

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). (Note: Throughout the Complaint, market share percentages have been rounded to the nearest whole number, but HHIs have been estimated using unrounded percentages in order to accurately reflect the concentration of the various markets.) The HHI takes into account the relative size distribution of the firms in a market and approaches zero when a market consists of a large number of small firms. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be highly concentrated. *See Horizontal Merger Guidelines* ¶ 1.51 (revised Apr. 8, 1997). Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the guidelines issued by the U.S. Department of Justice and Federal Trade Commission. *See id.*

07 1952

FILED

OCT 3 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS
United States of America

## DEFENDANTS
AT&T Inc., Dobson Communications Corporation

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT (IN U.S. PLAINTIFF CASES ONLY) __Bexar, Texas__
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Hillary Burchuk
U.S. Dept. of Justice, Antitrust Division
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530

ATTORNEYS (IF KNOWN)

Case: 1:07-cv-01952
Assigned To : Collyer, Rosemary M.
Assign. Date : 10/30/2007
Description: Antitrust

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- (X) 1 U.S. Government Plaintiff
- ( ) 2 U.S. Government Defendant
- ( ) 3 Federal Question (U.S. Government Not a Party)
- ( ) 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**(X) A. Antitrust**
- [X] 410 Antitrust

**( ) B. Personal Injury/Malpractice**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Medical Malpractice
- [ ] 365 Product Liability
- [ ] 368 Asbestos Product Liability

**( ) C. Administrative Agency Review**
- [ ] 151 Medicare Act

Social Security:
- [ ] 861 HIA ((1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g)
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g)

Other Statutes
- [ ] 891 Agricultural Acts
- [ ] 892 Economic Stabilization Act
- [ ] 893 Environmental Matters
- [ ] 894 Energy Allocation Act
- [ ] 890 Other Statutory Actions (If Administrative Agency is Involved)

**( ) D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**( ) E. General Civil (Other)** OR **( ) F. Pro Se General Civil**

Real Property
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent, Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

Personal Property
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

Bankruptcy
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

Prisoner Petitions
- [ ] 535 Death Penalty
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition

Property Rights
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 840 Trademark

Federal Tax Suits
- [ ] 870 Taxes (US plaintiff or defendant
- [ ] 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- [ ] 610 Agriculture
- [ ] 620 Other Food &Drug
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 630 Liquor Laws
- [ ] 640 RR & Truck
- [ ] 650 Airline Regs
- [ ] 660 Occupational Safety/Health
- [ ] 690 Other

Other Statutes
- [ ] 400 State Reapportionment
- [ ] 430 Banks & Banking
- [ ] 450 Commerce/ICC Rates/etc.
- [ ] 460 Deportation

- [ ] 470 Racketeer Influenced & Corrupt Organizations
- [ ] 480 Consumer Credit
- [ ] 490 Cable/Satellite TV
- [ ] 810 Selective Service
- [ ] 850 Securities/Commodities/Exchange
- [ ] 875 Customer Challenge 12 USC 3410
- [ ] 900 Appeal of fee determination under equal access to Justice
- [ ] 950 Constitutionality of State Statutes
- [ ] 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ⊙ G. *Habeas Corpus/ 2255* | ⊙ *Employment Discrimination* | ⊙ I. *FOIA/PRIVACY ACT* | ⊙ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ⊙ K. *Labor/ERISA (non-employment)* | ⊙ L. *Other Civil Rights (non-employment)* | ⊙ M. *Contract* | ⊙ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ⊙ 2 Removed from State Court  ⊙ 3 Remanded from Appellate Court  ⊙ 4 Reinstated or Reopened  ⊙ 5 Transferred from another district (specify)  ⊙ 6 Multi district Litigation  ⊙ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Section 7 of the Clayton Act, 15 U.S.C. Sec. 18; The contemplated transaction will likely result in less competition for wireless services in seven markets.

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  DEMAND $ _____  Check YES only if demanded in complaint  JURY DEMAND: YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE October 30, 2007  SIGNATURE OF ATTORNEY OF RECORD  /s/ Hillary B. Burchuk

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.