FILED

OCT 3 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>*Plaintiff,* )<br>)<br>v. )<br>)<br>AT&T INC. and DOBSON )<br>COMMUNICATIONS CORPORATION, )<br>)<br>*Defendants.* )<br>)<br>) | Case: 1:07-cv-01952<br>Assigned To : Collyer, Rosemary M.<br>Assign. Date : 10/30/2007<br>Description: Antitrust |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

### I. Nature and Purpose of the Proceeding

Defendants entered into an Agreement and Plan of Merger dated June 29, 2007, pursuant to which AT&T Inc. ("AT&T") will acquire Dobson Communications Corporation ("Dobson"). Plaintiff filed a civil antitrust Complaint on October 30, 2007 seeking to enjoin the proposed acquisition. The Complaint alleges that the likely effect of this acquisition would be to lessen competition substantially for mobile wireless telecommunications services in seven (7) geographic areas in the states of Kentucky, Missouri, Oklahoma, Pennsylvania and Texas, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. This loss of competition would result

2

in consumers facing higher prices, lower quality service and fewer choices of mobile wireless telecommunications services.

At the same time the Complaint was filed, plaintiff also filed a Preservation of Assets Stipulation and Order and proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, defendants are required to divest (a) Dobson's mobile wireless telecommunications services businesses and related assets in three (3) markets ("Wireless Business Divestiture Assets"); (b) AT&T minority interests in other mobile wireless telecommunications services providers in two (2) markets ("Minority Interests"), and (c) Dobson's Cellular One Assets, which include the Cellular One service mark and related assets ("Cellular One Assets") (collectively the "Divestiture Assets"). Under the terms of the Preservation of Assets Stipulation and Order, competition will be maintained, and defendants will take certain steps to ensure that, while the ordered divestiture is pending the Wireless Business Divestiture Assets and Cellular One Assets are preserved as competitively independent, economically viable and ongoing businesses. In addition, AT&T will not exercise any rights associated with its Minority Interests to control or influence the operations of the competing mobile wireless telecommunications services provider.

Plaintiff and defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof. Defendants have also stipulated that they will comply with the terms of the Preservation of Assets Stipulation and

2

Order and the proposed Final Judgment from the date of signing of the Preservation of Assets

Stipulation and Order, pending entry of the proposed Final Judgment by the Court and the

required divestitures. Should the Court decline to enter the proposed Final Judgment, defendants

have also committed to continue to abide by its requirements and those of the Preservation of

Assets Stipulation and Order until the expiration of time for appeal.

## II. Description of the Events Giving Rise to the Alleged Violation

### A. The Defendants and the Proposed Transaction

AT&T, with headquarters in San Antonio, Texas, is a corporation organized and existing

under the laws of the state of Delaware. AT&T is the largest communications holding company

in the United States and worldwide, measured by revenue. It also is the largest mobile wireless

telecommunications services provider in the United States, measured by subscribers, providing

mobile wireless telecommunications services in 50 states and serving in excess of 63 million

subscribers. In 2006, AT&T earned approximately $37.53 billion in mobile wireless

telecommunications services revenues.

Dobson, with headquarters in Oklahoma City, Oklahoma, is a corporation organized and

existing under the laws of the state of Oklahoma. Dobson is the ninth largest mobile wireless

telecommunications services provider in the United States, measured by subscribers, and

provides mobile wireless telecommunications services in 17 states. It has approximately 1.7

million subscribers. Dobson also owns Cellular One Properties, LLC, an Oklahoma limited

liability company, engaged in the business of licensing the Cellular One brand and promoting the

Cellular One service mark and certain related trademarks, service marks and designs. In 2006,

Dobson earned approximately $1.3 billion in revenues.

3

Pursuant to an Agreement and Plan of Merger dated June 29, 2007, AT&T will acquire Dobson for approximately $2.8 billion. If this transaction is consummated, AT&T and Dobson combined would have approximately 65 million subscribers in the United States, with $37.54 billion in mobile wireless telecommunications services revenues. The proposed transaction, as initially agreed to by defendants, would lessen competition substantially for mobile wireless telecommunications services in seven (7) relevant geographic markets. This acquisition is the subject of the Complaint and proposed Final Judgment filed by plaintiff.

### B. Mobile Wireless Telecommunications Services Industry

Mobile wireless telecommunications services allow customers to make and receive telephone calls and use data services using radio transmissions without being confined to a small area during the call or data session and without the need for unobstructed line-of-sight to the radio tower. More than 233 million people in the United States own mobile wireless telephones and annual revenues from the sale of mobile wireless telecommunications services in the United States were over $125 billion in 2006. To meet this strong demand for mobility, mobile wireless telecommunications services providers must deploy extensive networks of switches and radio transmitters and receivers and interconnect their networks with the networks of wireline carriers and other mobile wireless telecommunications services providers.

First-generation mobile wireless voice systems based on analog technology, now referred to as "1G" technology, were initially launched after the Federal Communications Commission ("FCC") issued the first spectrum licenses for mobile wireless telecommunications services in the early to mid-1980s. The FCC issued two cellular licenses (A-block and B-block) in each Metropolitan Statistical Area ("MSA") and Rural Service Area ("RSA") (collectively, "Cellular

4

Marketing Areas" or "CMAs"), with a total of 734 CMAs covering the entire United States. Each license consists of 25 MHz of spectrum in the 800 MHz band.

In 1995, the FCC licensed additional spectrum for the provision of Personal Communications Services ("PCS"), a category of services that includes mobile wireless telecommunications services comparable to those offered by cellular licensees. These licenses are in the 1900 MHz band and are divided into six blocks: A, B, and C, which consist of 30 MHz each; and D, E, and F, which consist of 10 MHz each. Geographically, the A and B-block 30 MHz licenses are issued by Major Trading Areas ("MTAs"), and C, D, E, and F-block licenses are issued by Basic Trading Areas ("BTAs"), several of which comprise each MTA. MTAs and BTAs do not generally correspond to MSAs and RSAs.

With the introduction of the PCS licenses, both cellular and PCS licensees began offering digital services. The use of digital technology enabled providers to increase network capacity, develop smaller handsets, and extend handset battery life. In addition, in 1996, one provider, a specialized mobile radio ("SMR" or "dispatch") spectrum licensee, began to use its SMR spectrum to offer mobile wireless telecommunications services comparable to those offered by other mobile wireless telecommunications services providers, in conjunction with its dispatch, or "push-to-talk," service. Although there are a number of providers holding spectrum licenses in each area of the country, not all providers have fully built out their networks throughout each license area. In particular, because of the characteristics of PCS spectrum, providers holding this type of spectrum have found it less attractive to build out in rural areas.

The vast majority of U.S. consumers have multiple choices for mobile wireless telecommunications service, with more than 98 percent of the total population residing in

5

counties where three or more mobile wireless telecommunications services operators offer digital service. Nearly all mobile wireless voice service has migrated to second-generation or "2G" digital technologies, GSM (global standard for mobility, a standard used by all carriers in Europe), and CDMA (code division multiple access). Even more advanced technologies ("2.5G" and "3G"), based on the earlier 2G technologies, have been deployed for mobile wireless data services.

### C. The Competitive Effects of the Transaction on Mobile Wireless Telecommunications Services

Mobile wireless telecommunications services allow customers to maintain their telephone calls or data sessions without wires when they are moving from place to place and include both voice and data services provided over a radio network. There are no cost-effective alternatives to mobile wireless telecommunications services. Because fixed wireless services do not allow customers to maintain their calls or data sessions while moving and do not permit the placement and receipt of calls from different locations, they are not regarded by consumers as a reasonable substitute for mobile wireless telecommunications services. It is unlikely that a sufficient number of customers would switch from mobile wireless telecommunications services so as to make a small but significant increase in the price of those services unprofitable.

A large majority of customers use mobile wireless telecommunications services in close proximity to their workplaces and homes. Thus, customers purchasing mobile wireless telecommunications services choose among mobile wireless telecommunications services providers that offer services where they live, work, and travel on a regular basis. The number and identity of mobile wireless telecommunications services providers varies among geographic

6

areas, as does the quality of services and breadth of geographic coverage offered by providers. Mobile wireless telecommunications services providers can and do offer different promotions, discounts, calling plans, and equipment subsidies in different geographic areas, thereby varying the price charged by geographic area.

The United States comprises numerous local geographic markets for mobile wireless telecommunications services. The geographic areas in which the FCC has licensed mobile wireless telecommunications services providers often represent the core areas in which an individual consumer would use mobile wireless telecommunications services, those being the areas in which an individual customer resides, works, and travels. The relevant geographic markets in which this transaction will substantially lessen competition in mobile wireless telecommunications services are effectively represented, but not defined, by the following FCC spectrum licensing areas: Kentucky RSA-6 (CMA 448); Kentucky RSA-8 (CMA 450); Missouri RSA-1 (CMA 504); Oklahoma RSA-5 (CMA 600); Pennsylvania RSA-5 (CMA 616); Texas RSA-9 (CMA 660); and Texas RSA-11 (CMA 662). It is unlikely that a sufficient number of customers would switch to mobile wireless telecommunications services providers in a different geographic market to make a small but significant price increase in the relevant geographic markets unprofitable.

The seven (7) geographic markets of concern for mobile wireless telecommunications services were identified by plaintiff via a fact-specific, market-by-market analysis that included consideration of, but was not limited to, the following factors: the number of mobile wireless telecommunications services providers and their competitive strengths and weaknesses; AT&T's and Dobson's market shares, along with those of the other providers; whether additional

7

spectrum is, or is likely soon to be, available; whether any providers are limited by insufficient

spectrum or other factors in their ability to add new customers; the concentration of the market,

and the breadth and depth of coverage by different providers in each market; the likelihood that

any provider would expand its existing coverage or that new providers would enter; whether

AT&T or Dobson own rights to control or influence the competitive operations of another

provider in the market; and the particular rights associated with any such minority interests.

### 1.    Overlap Areas

#### a.    AT&T/Dobson Overlap Markets

AT&T and Dobson each own a business that offers mobile wireless telecommunications

services in three relevant geographic areas:  Kentucky RSA-6 (CMA 448); Kentucky RSA-8

(CMA 450); and Oklahoma RSA-5 (CMA 600).  In each of these areas, either AT&T or Dobson

has the largest share of subscribers and the other defendant is a particularly strong and important

competitor.  The companies controlled by AT&T and Dobson collectively account for between

63 percent and 97 percent of subscribers in these areas.  As measured by the Herfindahl-

Hirschman Index ("HHI"), which is commonly employed in merger analysis and is defined and

explained in Appendix A to the Complaint, concentration in these markets ranges from over

3100 to more than 7900, which is well above the 1800 threshold at which the Department

considers a market to be highly concentrated.  After AT&T's proposed acquisition of Dobson is

consummated, the HHIs in the relevant geographic markets will range from over 5200 to over

9400, with increases in the HHI as a result of the merger ranging from over 1400 to over 2300,

significantly beyond the thresholds at which the Department considers a transaction likely to

cause competitive harm.

8

### b.    AT&T Minority Interest Markets

In two relevant geographic areas, Missouri RSA-1 (CMA 504) and Texas RSA-9 (CMA

660), Dobson owns a business that offers mobile wireless telecommunications services and

AT&T has a minority interest in a competing business. In Missouri RSA-1, AT&T's minority

equity interest is in Northwest Missouri Cellular Limited Partnership's business. In Texas RSA-

9, AT&T's minority equity interest is in Mid-Tex Cellular, Ltd. In these areas, either Dobson or

the business in which AT&T has a minority interest has the largest share and the other firm is a

particularly strong and important competitor in all, or a large part, of the RSA. In both areas, the

businesses in which AT&T and Dobson have an interest collectively account for in excess of 70

percent of mobile wireless subscribers.

Although AT&T's minority equity interests in Northwest Missouri Cellular LP and Mid-

Tex Cellular, Ltd. are small, AT&T has significant rights under each relevant partnership

agreement to control core business decisions, obtain critical confidential competitive

information, and share in profits at a rate significantly greater than the equity ownership share

upon a sale of the partnership. Post-merger, AT&T would likely have the ability and incentive to

coordinate the activities of the wholly-owned Dobson wireless business and the business in

which it has a minority stake, and/or undermine the ability of the latter to compete against the

former. Such activity would likely result in a significant lessening of competition.

### c.    AT&T/Cellular One Overlap Markets

In two relevant geographic areas, Pennsylvania RSA-5 (CMA 616) and Texas RSA-11

(CMA 662), AT&T owns a business that offers mobile wireless telecommunications services,

and a competing mobile wireless telecommunications business operates under the Cellular One

9

brand name that AT&T would acquire from Dobson pursuant to the proposed transaction. In these areas, AT&T has the largest share of subscribers and the mobile wireless telecommunications business operating under the Cellular One brand name is a particularly strong and important competitor. In each area, AT&T and the Cellular One licensee collectively account for in excess of 65 percent subscribers.

The Cellular One brand name was first used in 1984. In 1989, the Cellular One Group partnership was formed to maintain and promote the Cellular One brand, a licensed trade name. In 1995, the partnership offered to license the brand to all A block cellular providers. Presently, approximately nine mobile wireless telecommunications services providers in addition to Dobson license the Cellular One brand and offer services to their customers under that brand. Under the terms of the Cellular One licensing agreements it has entered into with other mobile wireless telecommunications services providers, it is required to promote and maintain the value of the mark. Through its planned purchase of Dobson, AT&T will acquire the rights to the Cellular One trademarks, trade names, service marks, service names, and designs for the Cellular One brand name, as well as the agreements to license the Cellular One brand to other mobile wireless telecommunications services providers.

The providers that continue to license and use the Cellular One brand have invested considerable resources in developing and building the brand. The Cellular One brand is thus an important input to these firms' provision of mobile wireless telecommunications services. If their ability to use the brand were to be impaired or eliminated, they would suffer considerable costs and effective competition in these markets would be harmed. Because AT&T offers and markets wireless services under its own AT&T brand, it has little or no incentive to use or

10

maintain the Cellular One brand. In the two relevant geographic areas where a Cellular One licensee is a primary competitor to AT&T in the mobile wireless telecommunications services market, AT&T would have the incentive and ability to impair the effectiveness of the Cellular One brand, or even deny a license to the current licensee entirely, since by doing so, it could reduce competition by significantly increasing costs to a primary competitor at little or no cost to itself. Although current Cellular One licensees could, in theory, re-brand their mobile wireless service in response to such conduct, not only would such a process be difficult, expensive, and disruptive, but it is unlikely that another brand could be obtained that would be as widely-recognized or as effective in promoting mobile wireless telecommunications services as the Cellular One brand.

### 2.    Competitive Impact

In all seven relevant geographic markets, the mobile wireless telecommunications businesses wholly or partially owned by AT&T and Dobson, and/or the Cellular One licensee, own all or most of the 800 MHz band cellular spectrum licenses, which are more efficient in serving rural areas than 1900 MHz band PCS spectrum. As a result of holding the cellular spectrum licenses and being early entrants into these markets, the networks wholly or partly owned by AT&T, Dobson, or the Cellular One licensee provide greater depth and breadth of coverage than their PCS-based competitors. A mobile wireless telecommunications services provider with limited coverage in a geographic area typically does not aggressively market its services in that area because it can service customers only through a roaming arrangement with a more built-out competitor under which it must pay roaming charges to, and rely on, its competitor to maintain the quality of the network and to support new features. The mobile

11

wireless businesses wholly or partly owned by AT&T or Dobson in five of the relevant areas, and by AT&T and the Cellular One licensee in the other two relevant areas, accordingly, are, for a large set of customers, likely closer substitutes for each other than the other mobile wireless telecommunications services in these markets provided by firms who own only PCS spectrum.

Competition between the businesses wholly or partly owned by AT&T and Dobson, or between AT&T and the Cellular One licensee, in the relevant geographic markets has resulted in lower prices and higher quality in mobile wireless telecommunications services, than would otherwise have existed in these geographic markets. In these areas, many consumers consider businesses wholly or partly owned by AT&T, Dobson, or the Cellular One licensee to be the most attractive competitors because other providers' networks lack coverage or provide lower-quality service.

Competition will be substantially lessened to the detriment of consumers if AT&T's proposed acquisition of Dobson is consummated without the required divestitures: (a) competition between AT&T and Dobson in mobile wireless telecommunications services will be eliminated in the three AT&T/Dobson overlap geographic markets and the relevant markets for mobile wireless telecommunications services will become substantially more concentrated; (b) AT&T would have the incentive and ability to diminish competition in mobile wireless telecommunications services between Dobson and the businesses partly owned by AT&T in the two AT&T minority ownership geographic markets; and (c) AT&T's acquisition of the rights to the Cellular One brand would give AT&T the incentive and ability to diminish the Cellular One licensee's ability to compete effectively in the two AT&T/Cellular One overlap geographic markets. In all seven relevant geographic areas, the merged firm will have the incentive and

12

ability to increase prices, diminish the quality or quantity of services provided, and refrain from
or delay making investments in network improvements.

### 3.    Entry

Entry by a new mobile wireless telecommunications services provider in the
relevant geographic markets would require the acquisition of spectrum licenses and the build-out
of a network, and thus would be difficult, time-consuming, and expensive. Although a number
of other firms in the relevant geographic areas own 1900 MHz PCS spectrum, the propagation
characteristics of that spectrum are such that signals extend to a significantly smaller area than do
800 MHz cellular signals. The relatively higher cost of building out 1900 MHz spectrum,
combined with the relatively low population density of the areas in question, make it unlikely
that competitors with 1900 MHz spectrum will build out their networks to reach the entire area
served by AT&T and Dobson. Although additional spectrum has been and will be made
available through FCC auctions, it is unlikely that additional mobile wireless telecommunications
services based on this spectrum will be deployed in the near future in the relevant geographic
areas. Therefore, new entry in response to a small but significant price increase for mobile
wireless telecommunications services by the merged firm in the relevant geographic markets
would not be timely, likely, or sufficient to thwart the competitive harm resulting from AT&T's
proposed acquisition of Dobson, if it were to be consummated.

For these reasons, the United States concluded that AT&T's proposed acquisition of
Dobson will likely substantially lessen competition, in violation of Section 7 of the Clayton Act,
in the provision of mobile wireless telecommunications services in the seven relevant geographic
markets alleged in the Complaint.

13

## III. Explanation of the Proposed Final Judgment

The divestiture requirements of the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition in mobile wireless telecommunications services in the seven (7) geographic markets of concern. The proposed Final Judgment requires defendants, within one hundred twenty (120) days after the consummation of the Transaction, or five (5) days after notice of the entry of the Final Judgment by the Court, whichever is later, to divest the Wireless Business Divestiture Assets, the Minority Interests and the Cellular One Assets. The Wireless Business Divestiture Assets are essentially Dobson's entire mobile wireless telecommunications services businesses in the three (3) markets where AT&T and Dobson are each other's closest competitors for mobile wireless telecommunications services. These assets must be divested in such a way as to satisfy plaintiff in its sole discretion that they will be operated by the purchaser as a viable, ongoing business that can compete effectively in each relevant market. Defendants must take all reasonable steps necessary to accomplish the divestitures quickly and shall cooperate with prospective purchasers.

In requiring the divestitures, plaintiff seeks to make certain that the potential buyer acquires all the assets it may need to be a viable competitor and replace the competition lost by the merger. The 25 MHz of cellular spectrum that must be divested is sufficient to support the operation and expansion of the mobile wireless telecommunications services businesses being divested, enabling the buyer to be a viable competitor to the merged entity. Plaintiff is not requiring the divestiture of the 10 MHz of PCS spectrum held by Dobson in the three (3) divestiture markets because that spectrum is not essential to the viability of the of the business to be divested. Moreover, in none of the three markets does Dobson's PCS spectrum holdings cover all counties in the RSA.

14

In the two relevant geographic markets where AT&T owns a minority interest in another mobile wireless services provider, the proposed Final Judgment requires defendants to divest or withdraw from these Minority Interests.  The informational and control rights associated with the minority interests created concerns that allowing the merged firm to continue to hold its existing interest and rights would diminish competition in markets where Dobson and the firm in which AT&T holds an interest were particularly strong, close competitors.  Requiring AT&T to relinquish its ownership and control rights in these entities, through divestiture or withdrawal, would eliminate the combined company's ability and incentive to limit competition between itself and the entities in which it owns minority interests.

The Cellular One Assets consist of all right, title and interest in trademarks, trade names, service marks, service names, designs, and intellectual property, all license agreements for use of the Cellular One mark, technical information, computer software and related documentation, and all records relating to the Cellular One Assets.  The proposed acquisition raised concerns that in two (2) markets, AT&T would have the incentive and ability to substantially impair the ability of its primary competitor, a Cellular One licensee, to compete effectively.  Under the proposed Final Judgment, the defendants are required to divest the Cellular One Assets to a buyer with the intent and capability to maintain and promote the Cellular One brand such that the current Cellular One licensees can continue to effectively use the brand to compete.

## A. Timing of Divestitures

In antitrust cases involving mergers or joint ventures in which the United States seeks a divestiture remedy, it requires completion of the divestitures within the shortest time period reasonable under the circumstances.  Section IV.A.g of the proposed Final Judgment in this case

15

requires divestiture of the Divestiture Assets, within one hundred twenty (120) days after the

consummation of the Transaction, or five (5) days after notice of the entry of the Final Judgment by

the Court, whichever is later. Plaintiff in its sole discretion may extend the date for divestiture of

the Divestiture Assets by up to sixty (60) days. Because the FCC's approval is required for the

transfer of the wireless licenses to a purchaser, Section IV.A provides that if applications for

transfer of a wireless license have been filed with the FCC, but the FCC has not acted dispositively

before the end of the required divestiture period, the period for divestiture of those assets shall be

extended until five (5) days after the FCC has acted. This extension is to be applied only to the

individual Wireless Business Divestiture Assets affected by the delay in approval of the license

transfer and does not entitle defendants to delay the divestiture of any other Divestiture Assets for

which license transfer approval is not required or has been granted.

The divestiture timing provisions of the proposed Final Judgment will ensure that the

divestitures are carried out in a timely manner, and at the same time will permit defendants an

adequate opportunity to accomplish the divestitures through a fair and orderly process. Even if all

Divestiture Assets have not been divested upon consummation of the transaction, there should be no

adverse impact on competition given the limited duration of the period of common ownership and

the detailed requirements of the Preservation of Assets Stipulation and Order.

### B. Use of a Management Trustee

The Preservation of Assets Stipulation and Order, filed simultaneously with this Competitive

Impact Statement, ensures that, prior to divestiture, the Divestiture Assets are maintained, the

Wireless Business Divestiture Assets remain an ongoing business concern, the Cellular One Assets

remain economically viable, and defendants will not exercise any legal or equitable rights it may

16

have in the Minority Interest entities. The Preservation of Assets Stipulation and Order is designed
to ensure that the Divestiture Assets will be preserved and remain independent of defendants, so that
competition is maintained during the pendency of the ordered divestiture.

The Preservation of Assets Stipulation and Order appoints a management trustee selected by
plaintiff to oversee the Wireless Business Divestiture Assets and the Cellular One Assets in the
relevant geographic markets. The appointment of a management trustee in this situation is required
because the Wireless Business Divestiture Assets are not independent facilities that can be held
separate and operated as stand-alone units by the merged firm. Rather, the Wireless Business
Divestiture Assets are an integral part of a larger network and, to maintain their competitive viability
and economic value, they should remain part of that network during the divestiture period. A
management trustee is necessary to oversee the continuing relationship between defendants and these
assets, to ensure that these assets are preserved and supported by defendants during this period, yet
run independently. The management trustee will also preserve and ensure the viability of the Cellular
One Assets. The management trustee will have the power to operate the Wireless Business
Divestiture Assets and the Cellular One Assets in the ordinary course of business, so that they will
remain independent and uninfluenced by defendants, and so that the Wireless Business Divestiture
Assets remain an ongoing and economically viable competitor to defendants and to other mobile
wireless telecommunications services providers. The management trustee will preserve the
confidentiality of competitively sensitive marketing, pricing, and sales information; ensure
defendants' compliance with the Preservation of Assets Stipulation and Order and the proposed Final
Judgment; and maximize the value of the Wireless Business Divestiture Assets and the Cellular One
Assets so as to permit expeditious divestiture in a manner consistent with the proposed Final

17

Judgment. Because defendants have agreed in the Preservation of Assets Stipulation and Order to forego exercising any rights they may have with respect to the Minority Interests pending disposal of those interests, and defendants do not have an active day-to-day role in managing the businesses of the Minority Interest Entities, it is unnecessary for the Minority Interests to be operated by the Management Trustee.

The Preservation of Assets Stipulation and Order provides that defendants will pay all costs and expenses of the management trustee, including the cost of consultants, accountants, attorneys, and other representatives and assistants hired by the management trustee as are reasonably necessary to carry out his or her duties and responsibilities. After his or her appointment becomes effective, the management trustee will file monthly reports with plaintiffs setting forth efforts taken to accomplish the goals of the Preservation of Assets Stipulation and Order and the proposed Final Judgment and the extent to which defendants are fulfilling their responsibilities. Finally, the management trustee may become the divestiture trustee, pursuant to the provisions of Section V of the proposed Final Judgment.

### C. Use of a Divestiture Trustee

In the event that defendants do not accomplish the divestiture within the periods prescribed in the proposed Final Judgment, the Final Judgment provides that the Court will appoint a trustee selected by plaintiff to effect the divestitures. As part of this divestiture, defendants must relinquish any direct or indirect financial ownership interests and any direct or indirect role in management or participation in control. Pursuant to Section V of the proposed Final Judgment, the divestiture trustee will own and control the Divestiture Assets until they are sold to a final purchaser, subject to safeguards to prevent defendants from influencing their operation.

18

Section V details the requirements for the establishment of the divestiture trust, the selection and compensation of the divestiture trustee, the responsibilities of the divestiture trustee in connection with the divestiture and operation of the Divestiture Assets, and the termination of the divestiture trust. The divestiture trustee will have the obligation and the sole responsibility, under Section V.D, for the divestiture of any transferred Divestiture Assets. The divestiture trustee has the authority to accomplish divestitures at the earliest possible time and "at such price and on such terms as are then obtainable upon reasonable effort by the Divestiture Trustee." In addition, to ensure that the divestiture trustee can promptly locate and divest to an acceptable purchaser, plaintiff, in its sole discretion, may require defendants to include additional assets, or allow defendants to substitute substantially similar assets, which substantially relate to the Divestiture Assets to be divested by the divestiture trustee.

The divestiture trustee will not only have responsibility for sale of the Divestiture Assets, but will also be the authorized holder of the wireless licenses, with full responsibility for the operations, marketing, and sales of the wireless businesses to be divested, and will not be subject to any control or direction by defendants. Defendants will no longer have any role in the ownership, operation, or management of the Divestiture Assets other than the right to receive the proceeds of the sale. Defendants will also retain certain obligations to support to the Divestiture Assets and cooperate with the divestiture trustee in order to complete the divestiture.

The proposed Final Judgment provides that defendants will pay all costs and expenses of the divestiture trustee. The divestiture trustee's commission will be structured, under Section V.G of the proposed Final Judgment, so as to provide an incentive for the divestiture trustee based on the price obtained and the speed with which the divestitures are accomplished. After his or her appointment

19

becomes effective, the divestiture trustee will file monthly reports with the Court and plaintiff setting forth his or her efforts to accomplish the divestitures. Section V.J requires the divestiture trustee to divest the Divestiture Assets to an acceptable purchaser or purchasers no later than six (6) months after the assets are transferred to the divestiture trustee. At the end of six (6) months, if all divestitures have not been accomplished, the trustee and plaintiff will make recommendations to the Court, which shall enter such orders as appropriate in order to carry out the purpose of the Final Judgment, including extending the trust or term of the trustee's appointment.

The divestiture provisions of the proposed Final Judgment will eliminate the anticompetitive effects of the transaction in the provision of mobile wireless telecommunications services. The divestitures of the Wireless Business Divestiture Assets and Minority Interests will preserve competition in mobile wireless telecommunications services by maintaining an independent and economically viable competitor in the relevant geographic markets. The divestiture of the Cellular One Assets will ensure that the Cellular One brand will be preserved and maintained so that the current Cellular One licensees can continue to compete effectively.

## IV. Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against defendants.

## V. **Procedures Available for Modification of the Proposed Final Judgment**

The United States and defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, which ever is later. All comments received during this period will be considered by the Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> Nancy M. Goodman
> Chief, Telecommunications and Media Enforcement Section
> Antitrust Division, U.S. Department of Justice
> 1401 H Street, N.W., Suite 8000
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

21

## VI. Alternatives to the Proposed Final Judgment

Plaintiff considered, as an alternative to the proposed Final Judgment, a full trial on the merits against defendants. Plaintiff could have continued the litigation and sought preliminary and permanent injunctions against AT&T's acquisition of Dobson. Plaintiff is satisfied, however, that the divestiture of assets and other relief described in the proposed Final Judgment will preserve competition for the provision of mobile wireless telecommunications services in the relevant markets identified in the Complaint.

## VII. Standard of Review Under the APPA for the Proposed Final Judgment

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 11 (D.D.C. 2007) (concluding that the 2004 amendments "effected minimal changes" to scope of

review under Tunney Act, leaving review "sharply proscribed by precedent and the nature of Tunney Act proceedings").[1]

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995). With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *"within the reaches of the public interest."* More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

---

[1]  The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006).

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2]  In making its public interest

determination, a district court "must accord deference to the government's predictions about the

efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations

because this may only reflect underlying weakness in the government's case or concessions made

during negotiation." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461

(noting the need for courts to be "deferential to the government's predictions as to the effect of the

proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C.

2003) (noting that the court should grant due respect to the United States' prediction as to the effect of

proposed remedies, its perception of the market structure, and its views of the nature of the case).

Court approval of a consent decree requires a standard more flexible and less strict than that

appropriate to court adoption of a litigated decree following a finding of liability. "[A] proposed

decree must be approved even if it falls short of the remedy the court would impose on its own, as

long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United*

*States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting

*United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v.*

*United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp.

619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed

---

[2] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what the Congress that enacted the Tunney Act in 1974 intended, as Senator Tunney then explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's

25

"scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings."

*SBC Commc'ns*, 489 F. Supp. 2d at 11.[3]

## VIII. <u>Determinative Documents</u>

There are no determinative materials or documents within the meaning of the APPA that were considered by plaintiff United States in formulating the proposed Final Judgment.

Dated: October 30, 2007

Respectfully submitted,

Hillary B. Burchuk (D.C. Bar No. 366755)
Lawrence M. Frankel (DC Bar No. 441532)
Rebekah P. Goodheart (DC Bar No. 472673)
Attorneys, Telecommunications & Media
Enforcement Section
Antitrust Division

U.S. Department of Justice
City Center Building
1401 H Street, N.W., Suite 8000
Washington, D.C.  20530
(202) 514-5621
Facsimile: (202) 514-6381

---

[3] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973)("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized."); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.").

26