# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | Case No. 1:07-cv-1952 (ESH) |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AT&T INC. and DOBSON | ) | |
| COMMUNICATIONS CORPORATION, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

### PLAINTIFF UNITED STATES'S RESPONSE TO PUBLIC COMMENTS

Pursuant to the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) ("APPA" or "Tunney Act"), the United States hereby responds to the public comment received regarding the proposed Final Judgment in this case. After careful consideration of the comment, the United States continues to believe that the proposed Final Judgment will provide an effective and appropriate remedy for the antitrust violation alleged in the Complaint. The United States will move the Court for entry of the proposed Final Judgment after the public comments and this Response has been published in the *Federal Register*, pursuant to 15 U.S.C. § 16(d).

On October 30, 2007, the United States filed the Complaint in this matter alleging that the proposed merger of two mobile wireless telecommunications service providers, AT&T Inc. ("AT&T") and Dobson Communications Corporation ("Dobson"), would violate Section 7 of the Clayton Act,  15 U.S.C. § 18.  Simultaneously with the filing of the Complaint, the plaintiff filed a proposed Final Judgment and a Preservation of Assets Stipulation and Order signed by the

United States and defendants consenting to the entry of the proposed Final Judgment after compliance with the requirements of the Tunney Act. Pursuant to those requirements, the United States filed a Competitive Impact Statement ("CIS") in this Court on October 30, 2007; published the proposed Final Judgment and CIS in the *Federal Register* on November 19, 2007, *see* 72 Fed. Reg. 65,060 (2007); and published a summary of the terms of the proposed Final Judgment and CIS, together with directions for the submission of written comments relating to the proposed Final Judgment, in the *Washington Post* for seven days beginning on November 18, 2007 and ending on November 24, 2007. The 60-day period for public comments ended on January 22, 2008, and one comment was received as described below and attached hereto.

I.    **<u>Background</u>**

As explained more fully in the Complaint and CIS, the likely effect of this acquisition would be to lessen competition substantially for mobile wireless telecommunications services in seven (7) geographic areas in the states of Kentucky, Missouri, Oklahoma, Pennsylvania and Texas. To restore competition in these markets, the proposed Final Judgment, if entered, would require defendants to divest (a) Dobson's mobile wireless telecommunications services businesses and related assets in three markets; (b) AT&T minority interests in other mobile wireless telecommunications services providers in two markets, and (c) Dobson's Cellular One Assets, which include the Cellular One service mark and related assets. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and punish violations thereof.

**II.     Legal Standard Governing the Court's Public Interest Determination**

Upon publication of the public comments and this Response, the United States will have fully complied with the Tunney Act.  It will then ask the Court to determine that entry of the proposed Final Judgment would be "in the public interest," and to enter it.  15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004,[1] is required to consider:

> (A)     the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B)     the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest."  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).

---

[1]  The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms.  *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 11 (D.D.C. 2007) (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

3

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); see also *Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001). Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "within the reaches of the public interest." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2]  In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the

---

[2] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) *(quoting United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in

the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. Id. at 1459-60. As this Court recently confirmed in SBC Communications, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language codified what the Congress that enacted the Tunney Act in 1974 intended, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11.[3]

---

[3] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973)("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized."); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court,

III.    **Summary of Public Comment and the United States's Response**

During the 60-day public comment period, the United States received one comment – from Mid-Tex Cellular, Ltd. ("Mid-Tex"), a wireless competitor to the merging firms in certain geographic areas – which is attached hereto and summarized below.  Upon review, the United States believes that nothing in the comment warrants a change in the proposed Final Judgment or is sufficient to suggest that the proposed Final Judgment is not in the public interest.  The comment, in essence, argues that the United States should have identified, alleged, and remedied a different competitive concern than the one explained in the United States's Complaint.  Copies of this Response and its attachment have been mailed to Mid-Tex.

A.    Factual Background: Texas RSA 9

The United States's Complaint alleges that the merger of AT&T and Dobson would tend to lessen competition substantially, in violation of Section 7 of the Clayton Act, in the provision of mobile wireless telecommunications services in seven geographic areas, including Texas RSA 9 – the subject of Mid-Tex's comments.  The competitive landscape in Texas RSA 9 is somewhat complicated, and thus, this description is provided to assist in understanding the comments of Mid-Tex, the nature of the competitive concerns reflected in the United States's Complaint, and how the proposed Final Judgment adequately redresses the concerns.

Throughout the United States, in each local geographic area the Federal Communications Commission issues two cellular licenses, an "A side" and a "B side," in the 800 MHz spectrum

in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.").

band for the provision of wireless service, as well as a number of PCS licenses in the 1900 MHz spectrum band. In rural areas, the cellular licenses are more attractive to carriers than PCS licenses because the propagation characteristics of this spectrum band allow sparsely populated areas to be served more efficiently. Frequently in rural areas, holders of PCS licenses do not fully build out their networks, except in areas where the population density is higher or there are major highways.

In Texas RSA 9, Dobson controls one of the two cellular licenses – the "A-side" license – throughout the entire RSA, and operates RSA-wide using that license. The situation for the "B-side" cellular license is much more complicated, as the license is split, geographically, between three different carriers. Mid-Tex, an entity in which AT&T had a minority interest,[4] controls the "B-side" license in five of the eleven counties that comprise the RSA, and a portion of a sixth. AT&T controls the "B-side" license in two counties in the RSA, and portions of three others.[5] And, a third company, Alltel Corporation, controls the "B-side" license in one county and a portion of two others.

---

[4] AT&T withdrew from the Mid-Tex Cellular, Ltd. partnership on December 15, 2007, and thus, no longer has a minority interest in Mid-Tex. This withdrawal was accomplished pursuant to Sections II.H and Section IV of the proposed Final Judgment in this matter and Section IV.B of the Preservation of Assets Stipulation and Order signed by this Court on November 12, 2007, which requires the defendants to comply with the proposed Final Judgment pending the Judgment's entry.

[5] It is these counties, where AT&T owns the cellular licenses, that constitute the Texas RSA 9B1 and 9B4 partition areas that Mid-Tex refers to in its comment. Texas RSA 9B1 includes Eastland County and a portion of Erath County, and Texas RSA 9B4 includes Somervell County and portions of Bosque County and Hill County. AT&T also controls some PCS licenses throughout the RSA.

In conducting an investigation of the merger of two mobile wireless providers, the United States does a fact-specific market-by-market analysis that examines a number of factors, including, but not limited to, the number of mobile wireless providers and their competitive strengths and weaknesses, market shares of the merging companies and other providers, the depth and breadth of coverage of providers and whether providers could expand their existing coverage.[6]  In investigating the proposed merger of AT&T and Dobson, the United States considered the competitive effects of the combination of the Dobson and AT&T wholly-owned wireless business in Texas RSA 9, as well as the effect of AT&T retaining a minority interest in the Mid-Tex business subsequent to acquiring the Dobson business.  However, the United States concluded that only the retention of the minority interest in Mid-Tex raised competitive concerns in the RSA and alleged only that harm in its Complaint.[7]

With regard to the wholly-owned businesses, the United States did not have sufficient reason to allege that the combination of the Dobson and AT&T businesses would present a competitive concern.  AT&T's cellular license ownership is limited to a small minority of the

_____

[6] Competitive Impact Statement at 7-8.

[7] In the Complaint, Texas RSA 9 is not alleged as an "AT&T/Dobson Overlap Market" in which the combination of the two businesses is the source of the competitive concern; instead, it is listed in the portion of the Complaint which discusses "AT&T Minority Interest Markets" and the competitive problem is described as follows: "[E]ither Dobson or the business in which AT&T has a minority interest has the largest share and the other defendant is a particularly strong and important competitor in all, or a large part, of the RSA. . . . . Post-merger, the merged firm would likely have the ability and incentive to coordinate the activities of the wholly-owned Dobson wireless business and the business in which it has a minority stake, and/or undermine the ability of the latter to compete against the former.  Such activity would likely result in a significant lessening of competition."  Complaint ¶¶ 21-22.  Thus, the competitive problem alleged by the United States in Texas RSA 9 is the combination of Dobson and Mid-Tex (minority owned by AT&T); it is that problem – and only that problem – that the proposed decree properly seeks to remedy.

9

geographic area of the RSA – essentially a strip of two counties, and portions of three others, along the northern border of the RSA. Although it competes to a limited extent elsewhere in the RSA via its PCS licenses,[8] AT&T appears to be a strong competitor primarily only in the areas where it is the cellular licensee. However, in that small portion of the RSA, there are three other competitors offering wireless service via a network built out utilizing their PCS spectrum: Sprint, Verizon, and T-Mobile. Based on these facts, the United States did not believe it could successfully allege and prove that the combination of the Dobson and AT&T wholly-owned wireless businesses would be likely to reduce competition substantially in the RSA, and thus, it made no such allegation.

On the other hand, Mid-Tex controls the cellular licenses for a much larger portion of the RSA – five counties, and a portion of a sixth. Moreover, the PCS carriers appear to have much less of a competitive presence in that portion of the RSA (including very limited networks) than in the area where AT&T controls the "B-side" license. It thus appears that Dobson and Mid-Tex are the two strongest competitors in five-and-a-half counties which comprise a large portion of the RSA, facing little effective competition there from the PCS providers. Therefore, any significant diminution of either company's ability to function as an independent, aggressive competitive constraint likely would tend to lessen competition substantially. As alleged in the Complaint, AT&T had important management and control interests in Mid-Tex and thus, "[p]ost-merger, the merged firm would likely have the ability and incentive to coordinate the activities of the wholly-owned Dobson wireless business and [Mid-Tex], and/or undermine the

---

[8] In the counties in this RSA where AT&T only has PCS spectrum, its network is built out to a very limited extent, covering less than 15% of the population.

ability of the latter to compete against the former." The United States sought to remedy the identified competitive problem by including in the proposed Final Judgment a requirement that the merged firm divest itself of the minority interest in Mid-Tex.

B.    Summary of Comment

Mid-Tex raises two concerns regarding Texas RSA 9. First, it contends that the merged firm should be required to divest not only its minority interest in Mid-Tex, but also either the Dobson "A side" cellular license throughout the entire RSA, or AT&T's other "B side" interests in the RSA.[9] According to Mid-Tex, such a divestiture is necessary "for the same reasons" that the United States concluded that it was necessary for the merged firm to divest its interest in Mid-Tex: it argues that in certain subdivisions of Texas RSA 9, the merged firm would have "well in excess of 70 percent of subscribers." Second, Mid-Tex argues that AT&T should not be prohibited from reacquiring a non-controlling interest in Mid-Tex during the ten-year term of the proposed Final Judgment. It contends that the proposed decree's prohibition on reacquisition is unnecessarily broad in that a reacquisition might not be harmful to competition if either (a) it was completely passive, or (b) competitive conditions had changed by the time of the proposed reacquisition.

---

[9] Although Mid-Tex operates in Texas RSA 9, it appears from its website that Mid-Tex does not compete in the Texas RSA 9B1 or 9B4 partition areas, the subdivisions that are the primary focus of its comment.

C.    Response

Mid-Tex does not take issue with the divestiture remedy embodied in the Final Judgment as far as it goes (except for the reacquisition provision), but instead contends that it does not go far enough: essentially, it argues that the United States should have identified, and alleged, a different, additional competitive problem in its Complaint and remedied that problem.  Mid-Tex contends that the overlap between the Dobson business, and the business controlled directly by AT&T in the "Texas 9B1 market" and "Texas 9B4 market"[10] pose a competitive problem and that, therefore, the merged firm should be required to divest either the Dobson or AT&T interests in those areas.  But as described above, the United States was unable to conclude that the combination of the Dobson business and the wholly-owned AT&T business was likely to reduce competition substantially in the alleged geographic market, Texas RSA 9, due to the relatively small portion of the RSA covered by AT&T's cellular licenses and the presence of multiple other competitors in that portion.[11]  Accordingly, the United States did not allege that the combination of the Dobson and wholly-owned AT&T businesses posed a competitive concern in this RSA, nor did it seek to remedy any such concern.

With regard to Mid-Tex's second concern, regarding the reacquisition clause, it is typical for antitrust consent decrees containing a divestiture remedy to bar the merged firm from

---

[10] The geographic market as alleged in the United States's Complaint is represented by all of Texas RSA 9; the United States did not allege a "partitioned Texas 9B1 market" or "Texas 9B4 market" as referred to by Mid-Tex.  *See* Mid-Tex Comment at 2-3.

[11] Mid-Tex claims that, according to its estimates, in the Texas RSA 9B1 and 9B4 portions of the RSA, the combined Dobson and AT&T businesses "serve 90-95% of wireless subscribers."  It, however, provides no source for those estimates and, indeed, those estimates are not supported by the information reviewed by the United States.

reacquiring the divested assets during the ten-year term of the decree.  Such a provision is

typically included because, except in unusual circumstances, it would defeat the purposes of a

divestiture to allow the merged firm to simply reacquire the divested assets.  Mid-Tex contends

that if AT&T were to reacquire a "truly passive" non-controlling interest in Mid-Tex, it would

not pose a competitive concern.  But this is not necessarily the case: in some circumstances, even

a passive interest can have anticompetitive consequences, e.g., reducing the incentives of the

merged firm to use its wholly-owned business in the market in question to compete aggressively.

A bright line prohibition on reacquisition – similar to that contained in numerous prior consent

decrees entered by this Court[12] – ensures easy administrability as well as the ultimate success of

the proposed divestiture, and it does so in a way that causes no undue harm to consumers or

other third parties.[13]

        Moreover, Mid-Tex contends that "if market conditions change" during the term of the

proposed Final Judgment, a reacquisition by AT&T would not necessarily threaten competition.

But this is the case in every antitrust consent decree: market conditions can always change in a

way that moot the need for a decree, or any specific provisions thereof.  If market conditions

---

[12]  *See, e.g., United States v. Amsted Industries, Inc.,* ¶ XII, No. 1:07-cv-00710 (JDB)
 (D.D.C. July 16, 2007) (Final Judgment), *available at*
http://www.usdoj.gov/atr/cases/f224900/224931.htm; *United States v. Cal Dive Int'l, Inc.,* ¶ XII,
No. 1:05CV02041 (EGS) (D.D.C. Jan. 12, 2006) (Final Judgment), *available at*
http://www.usdoj.gov/atr/cases/f213100/213177.htm; *United States v. Cingular Wireless Corp.*,
¶ XI, No. 1:04CV01850 (RBW) (D.D.C. Mar. 14, 2005) (Final Judgment), *available at*
http://www.usdoj.gov/atr/ cases/f208000/208093.htm.

[13]  Mid-Tex briefly suggests that the no reacquisition prohibition could harm Mid-Tex.
But, it is difficult to see why barring one out of an almost infinite number of possible investors
from purchasing an interest in a company is, in itself, likely to cause undue harm to that
company.  Indeed, if the only entity willing to invest in a firm were one of its most important
direct competitors, that in itself might warrant at least some reason for competitive concern.

change, the appropriate solution is a motion to modify the decree.  The United States has

supported a motion to modify, and the Court has modified, the reacquisition clause in

appropriate circumstances.[14]  The fact that market conditions might change in the future is not a

reason to modify or delete otherwise important provisions from a decree before it has even been

entered.

---

[14] *See, e.g., U.S. v. SBC Commc'ns, Inc.*, 339 F. Supp.2d 116 (D.D.C. 2004) (modifying reacquisition clause of Final Judgment).

**IV.    Conclusion**

After careful consideration of this public comment, the United States still concludes that entry of the proposed Final Judgment will provide an effective and appropriate remedy for the antitrust violation alleged in the Complaint and is, therefore, in the public interest.  Pursuant to Section 16(d) of the Tunney Act, the United States is submitting the public comment and its Response to the *Federal Register* for publication.  After the comments and its Response are published in the *Federal Register*, the United States will move this Court to enter the proposed Final Judgment.

Respectfully submitted,

_____/s/_____
Hillary B. Burchuk (D.C. Bar No. 366755)
Lawrence M. Frankel (DC Bar No. 441532)
Attorney, Telecommunications & Media
        Enforcement Section
Antitrust Division

U.S. Department of Justice
City Center Building
1401 H Street, N.W., Suite 8000
Washington, D.C.  20530
(202) 514-5621
Facsimile: (202) 514-6381

Certificate of Service

I hereby certify that on March 4, 2008, a copy of the foregoing Plaintiff United States'

Response to Public Comments was mailed via first class mail, postage prepaid, upon counsel for

Mid-Tex Cellular, Ltd., addressed as follows:

> Michael R. Bennet
> Bennet & Bennet, PLLC
> 4350 East West highway
> Suite 201
> Bethesda, MD  20814

> _____/s/_____
> Hillary B. Burchuk (D.C. Bar No. 366755)
> Telecommunications & Media
>   Enforcement Section
> Antitrust Division
> U.S. Department of Justice
> City Center Building
> 1401 H Street, N.W., Suite 8000
> Washington, D.C.  20530
> (202) 514-5621
> Facsimile: (202) 514-6381

**Before the**
**United States Department of Justice**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| United States of America v. AT&T | ) |
| Inc. and Dobson Communications | ) |
| Corporation, U.S. District Court for | ) |
| the District of Columbia Case No. | ) |
| 1:07-cv-01952; Proposed Final | ) |
| Judgment and Competitive Impact | ) |
| Statement | ) |

## COMMENTS OF MID-TEX CELLULAR, LTD.

Mid-Tex Cellular, Ltd. ("Mid-Tex"), by its attorneys, and pursuant to the Notice

published November 19, 2007 in the *Federal Register* (Vol. 72, No. 222), hereby submits

its comments on the proposed settlement in the above-captioned U.S. District Court

proceeding. In its Competitive Impact Statement ("CIS") filed by the Antitrust Division

of the U.S. Department of Justice ("Department") in that proceeding, the Department

concluded that AT&T Inc.'s ("AT&T") proposed acquisition of Dobson Communications

Corporation ("Dobson") will likely substantially lessen competition, in violation of

Section 7 of the Clayton Act, in the provision of mobile wireless telecommunications

services in the Texas RSA-9 (CMA 660) market ("Texas RSA-9"), among other

markets.[1] The Department filed a proposed Final Judgment which requires AT&T to

divest its interest in Mid-Tex. For the reasons stated in its petition opposing the transfer

of control of Dobson's wireless radio licenses to AT&T, filed with the Federal

---

[1] *United States v. AT&T Inc. and Dobson Communications Corporation; Proposed Final Judgment and Competitive Impact Statement*, 72 Fed. Reg. 65060 (Department of Justice Antitrust Division Nov. 19, 2007).

Communications Commission on August 27, 2007 ("Petition")[2], Mid-Tex, with one

exception, supports the proposed Final Judgment as it relates to the proposed divestiture

of AT&T's interest in Mid-Tex.[3]  For the same reasons as well as those stated below,

Mid-Tex urges the Department to require the divestiture of a portion of AT&T's

remaining interests in Texas RSA-9.[4]

I.    **The Department Should Require AT&T To Divest a Portion of its Wireless
      Interests *Throughout* Texas RSA-9.**

Specifically, Mid-Tex requests that the Department require AT&T to divest

either: (1) the A band license for the Texas RSA-9 market held by Dobson Cellular

Systems, Inc., a wholly owned subsidiary of Dobson; or (2) its ownership interests in

Texas 9B1 Limited Partnership, the Cellular B Block licensee in the partitioned Texas

9B1 market, *and* the license for the partitioned Texas 9B4 market held by AT&T

Mobility Texas, LLC, a wholly owned subsidiary of AT&T.  As discussed below, for the

same reasons the Department has found divestiture of AT&T's interests in Mid-Tex to be

necessary, the further divestiture of AT&T's interests in the Texas 9 RSA is also

necessary.

The proposed Final Judgment requires the divestiture of AT&T's minority interest

in Mid-Tex.  The Department found that, without such divestiture, the merged AT&T

"would likely have the ability and incentive to coordinate the activities of the wholly-

---

[2] A copy of the Petition was submitted to the Department by letter dated August 29, 2007.
[3] As discussed in Section II *infra*, Mid-Tex opposes a ten year restriction on AT&T
reacquiring *any* ownership interest in Mid-Tex.
[4] Mid-Tex's position herein is not intended to address and should not be construed as its
concurrence that the actions taken or proposed herein resolve all anti-competitive issues
resulting from AT&T's actions in Texas RSA-9.

owned Dobson wireless business and the business in which it has a minority stake, and/or

undermine the ability of the latter to compete against the former" and that "[s]uch activity

would likely result in a significant lessening of competition." in violation of Section 7 of

the Clayton Act.[5]  The Department reached this conclusion based on its finding that in

Texas RSA-9 the businesses in which AT&T and Dobson have an interest collectively

account for in excess of 70 percent of subscribers and that AT&T has significant rights

under the Mid-Tex partnership agreement to control core business decisions, obtain

critical confidential competitive information, and share in profits at a rate significantly

greater than the equity ownership share upon a sale of the partnership.[6]


In the partitioned Texas 9B1 market, the businesses in which AT&T and Dobson

have an interest collectively account for well in excess of 70 percent of subscribers[7], and,

as the sole general partner in Texas RSA 9B1 Limited Partnership, AT&T has a

controlling interest in that entity.[8]  In the partitioned Texas 9B4 market, AT&T and

Dobson collectively account for well in excess of 70 percent of subscribers.[9]

---

[5] Department of Justice Complaint in the above-captioned proceeding ("Complaint") at par. 22; Competitive Impact Statement ("CIS"), 72 Fed. Reg. at 65072. The Department found that in Texas RSA-9 "the merged firm will have the incentive and ability to increase prices, diminish the quality or quantity of services provided, and refrain from or delay making investments in network improvements." 72 Fed. Reg. at 65072.
[6] *Id.* at pars. 21-22.
[7] By Mid-Tex's estimation, Dobson and the AT&T controlled Texas RSA 9B1 Limited Partnership serve 90-95% of wireless subscribers in the partitioned Texas RSA 9B1 market.
[8] *See* FCC Ownership Disclosure Information for the Wireless Telecommunications Services (FCC Form 602) filed by Texas RSA 9B1 Limited Partnership on February 26, 2007. New Cingular Wireless PCS ("NCW PCS") holds a one percent general partnership interest in Texas RSA 9B1 Limited Partnership. *Id.* at Exhibit 1. NCW PCS is a wholly owned subsidiary of Cingular Wireless II, LLC, which has two members: AT&T Mobility LLC f/k/a Cingular Wireless LLC ("AT&T Mobility") (57%) and New

The Department recognizes that in Texas RSA-9, "either Dobson or the business in which AT&T has a minority interest has the largest share and the other firm is a particularly strong and important competitor in all, or a large part, of the RSA." Due to the combined market share throughout the RSA, the Department should treat the remainder of Texas RSA-9 as it has already decided to treat Texas RSA-9B2, and require AT&T to divest a portion of its remaining interests in the market. To allow AT&T to retain wireless interests it holds outright or through a controlling general partnership interest, while requiring it to divest minority, yet controlling, limited partnership interests is inconsistent and without justifiable basis.[10]

## II.    AT&T Should Not be Prohibited From Reacquiring a Non-Controlling Interest in Mid-Tex.

Although Mid-Tex supports the Department's decision to condition merger approval on AT&T's divestiture of its interest in Mid-Tex in Texas 9B2, Mid-Tex opposes the proposed condition that AT&T be barred from reacquiring any part of its interest in Mid-Tex during the proposed ten year term of the Final Judgment. The Department's rationale for the divestiture requirement in Texas 9B2 is AT&T's ability to control Mid-Tex through rights granted to it under the partnership agreement. If AT&T

---

Cingular Wireless Services, Inc. ("NCWS") (43%). *Id.* NCWS is a direct wholly owned subsidiary of AT&T Mobility, which, in turn, is an indirect wholly owned subsidiary of AT&T. SWBW B-Band Development LLC ("SWBW"), a wholly owned subsidiary of NCW PCS, holds a 43.1449% limited partnership interest in Texas RSA 9B1 Limited Partnership. *Id.*

[9] As discussed above, the B Block cellular license is held by AT&T Mobility Texas, LLC, a wholly owned subsidiary of AT&T. By Mid-Tex's estimation, Dobson and AT&T serve 90-95% of wireless subscribers in the partitioned Texas RSA 9B4 market.

[10] Conversely, if divestiture is not required in the remainder of Texas RSA-9, it should not be required in Texas RSA 9B2. The entire market should be treated consistently.

wishes to reinvest in Mid-Tex as a truly passive investor within the ten year effective period of the Final Judgment, it should not be prohibited from doing so. Such a prohibition will harm only Mid-Tex and not competition in Texas 9B2. Such reacquisition of divestiture assets should not be permitted, however, absent Department review of the amended limited partnership agreement, to enable the Department to ensure that AT&T has not regained rights to control core business decisions, obtain critical confidential competitive information, and share in profits at a rate significantly greater than the equity ownership share upon a sale of the partnership.[11]

---

[11] In addition, if market conditions change during the ten year effective period such that the Department is able to determine that AT&T control of Mid-Tex would no longer threaten competition, AT&T should then be permitted to acquire a controlling interest in Mid-Tex.

### III.    Conclusion

For the foregoing reasons, Mid-Tex respectfully requests that the Department require the additional divestitures discussed herein, and permit AT&T to reacquire a limited interest in Mid-Tex as discussed herein. Should the Department have any questions regarding the matters addressed herein, please communicate directly with the undersigned.

Respectfully submitted,

**MID-TEX CELLULAR, LTD.**

Michael R. Bennet
Bennet & Bennet, PLLC
4350 East West Highway
Suite 201
Bethesda, MD 20814
202-371-1500

January 18, 2008

cc: Hillary Burchuk

## DECLARATION OF TONEY PRATHER

I, Toney Prather, do hereby declare under penalty of perjury the following:

1.    I am the Manager of, and President of the sole member of the managing general partner of, Mid-Tex Cellular, Ltd.

2.    I have read the foregoing Comments of Mid-Tex Cellular Ltd.  I have personal knowledge of the facts set forth therein, and believe them to be true and correct.

_____
Toney Prather


_____1/11/08_____
Date


U:\Docs2\Clients\Mid-Tex Cellular, LTD\AT&T Dobson
TC\DOJcomments7.n16mb.doc