UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
|                                ) | |
|     Plaintiff,                 ) | |
|                                ) | |
|     v.                         ) | Civil Action No. 07-1952 (ESH) |
|                                ) | |
| AT&T INC. and DOBSON           ) | |
| COMMUNICATIONS CORP.,          ) | |
|                                ) | |
|     Defendants.                ) | |

**MEMORANDUM OPINION**

The United States of America brings this case against AT&T Inc. ("AT&T") and Dobson Communications Corp. ("Dobson") for antitrust violations arisng out AT&T's acquisition of Dobson. The government "alleges that the likely effect of this acquisition would be to lessen competition substantially for mobile wireless telecommunications services in seven (7) geographic areas in the states of Kentucky, Missouri, Oklahoma, Pennsylvania, and Texas, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18." (Competitive Impact Stmt. ["CIS"] at 1.) Pending before the Court is the government's Motion for Entry of the Final Judgment in this case. For the reasons stated herein, the Court will grant the motion.

**BACKGROUND**

I.    **Defendants and the Proposed Transaction**

AT&T, with headquarters in San Antonio Texas, is a corporation organized and existing under the laws of the state of Delaware. (CIS at 3.) In terms of revenues, it is the largest communications holding company both in the United States and globally, and it is the largest mobile

1

wireless services telecommunications services provider in the United States as measured by subscribers. (*Id.*)

Dobson, is a corporation organized under the laws of Oklahoma and is headquartered in Oklahoma City. (*Id.*) It is the ninth largest mobile wireless telecommunications services provider in the United States, as measured by number of subscribers. (*Id.*) Dobson also owns Cellular One Properties, L.L.C., an Oklahoma limited liability corporation, which licenses the Cellular One brand and promotes the Cellular One service mark and certain related trademarks, service marks and designs. (*Id.*)

On June 29, 2007, AT&T and Dobson entered in an agreement by which AT&T will acquire Dobson for approximately $2.8 billion. (*Id.* at 4.)

## II.     Alleged Harm as a Result of the Acquisition

In identifying the potentially harmful impact of the proposed acquisition, the government considered, *inter alia*,

> the number of mobile wireless telecommunications services providers and their competitive strengths and weaknesses; AT&T's and Dobson's market shares, along with those of other providers; whether additional spectrum is, or is likely soon to be, available; whether any providers are limited by insufficient spectrum or other factors in their ability to add new customers; the concentration of the market, and the breadth and depth of coverage by different providers in each market; the likelihood that any provider would expand its existing coverage or that new providers would enter; whether AT&T or Dobson own rights to influence the competitive operations of another provider in the market; and the particular rights associated with any such minority interests.

(*Id.* at 7-8.) Based on this fact-intensive analysis, the government determined that defendants' proposed transaction would substantially lessen competition in mobile wireless communication services in seven geographic areas, which are represented by the following FCC spectrum licensing

areas: Kentucky RSA-6 (CMA 448); Kentucky RSA-8 (CMA 450); Missouri RSA-1 (CMA 504); Oklahoma RSA-5 (CMA 600); Pennsylvania RSA-5 (CMA 616); Texas RSA-9 (CMA 660); and Texas RSA-11 (CMA 662).  (*Id.* at 7.)

In three areas, Kentucky RSA-6, Kentucky RSA-8, and Oklahoma RSA-5, "either AT&T or Dobson has the largest share of subscribers and the other defendant is a particularly strong and important competitor." (*Id.* at 8.)  The proposed acquisition would therefore result in increased concentration in these markets to a level likely to cause competitive harm.  (*Id.*)  In two areas, Missouri RSA-1 and Texas RSA-9, greater than 70% of mobile wireless subscribers are served either by a business owned by Dobson or a company in which AT&T has a minority equity interest and exercises significant control over core business decisions.  (*Id.* at 9.)  "Post-merger, AT&T would likely have the ability and incentive to coordinate the activities of the wholly-owned Dobson wireless business and the business in which it has a minority stake, and/or undermine the ability of the latter to compete against the former," which would result in a lessening of competition.  (*Id.*)  Finally, in two areas, Pennsylvania RSA-5 and Texas RSA-11, AT&T is the largest provider of wireless communication services and a business operating under the Cellular One brand name owned by Dobson is a strong and important competitor.  (*Id.* at 9-10.)  The providers that operate under the Cellular One brand "have invested considerable resources in developing and building the brand." (*Id.* at 10.)    The proposed acquisition would give AT&T all rights to the Cellular One brand, and would give AT&T "the incentive and ability to impair the effectiveness of the Cellular One brand, or even deny a license to the current licensee entirely, since by doing so, it could reduce competition by significantly increasing costs to a primary competitor at little or no cost to itself." (*Id.* at 11.)  "In all seven markets, the providers wholly or partially owned by AT&T and Dobson,

and/or a Cellular One licensee control all or most of the 800 MHz band cellular spectrum licenses, which are more efficient in serving rural areas than 1900 MHz band PCS spectrum" making new entries into these markets time-consuming, expensive, and unlikely. (*Id.* at 11-12.)

## III.    Procedural History

The government filed a complaint in this matter on October 30, 2007, alleging that the proposed acquisition of Dobson by AT&T violates Section 7 of the Clayton Act. Simultaneously with the filing of the complaint, the government filed a proposed Final Judgment and a Preservation of Assests Stipulation and Order in which the parties consented to the entry of the proposed Final Judgment after compliance with the requirements of the Tunney Act. Pursuant to those requirements, the government also filed a CIS, describing the alleged anti-trust concerns surrounding the acquisition and explaining the proposed Final Judgment.

The proposed Final Judgment is designed to remedy the anti-competitive imapct of the acquisition in the seven markets of concern. It requires defendants, within 120 days after the completion of the transaction or five days after the entry of the Final Judgment, to divest (1) Dobson's entire mobile wireless telecommunications services business in the three markets where AT&T and Dobson are each other's closest competitors (the "Wireless Business Divestiture Assests"); (2) AT&T's minority interests in the two markets in which a Dobson company and a company in which AT&T holds an interest service more than 70% of subscribers (the "Minority Interests"); and (3) all assets related to the Cellular One brand ("the Cellular One Assets").[1] (CIS

---

[1] The government may, at its discretion, extend the time for divestiture by up to 60 days. Additionally, because the FCC's approval is required for the transfer of wireless licenses, if the applications for the transfer of a wireless license are filed with the FCC, but the FCC has not acted before the end of the divestiture period, the period for divestiture of these assets will be extended until five days after the FCC has acted. (CIS at 15-16.)

at 14-15; Final Judgment at 8.)  The Final Judgment further provides that should the defendant not accomplish the divestiture within the prescribed period, the Court will appoint a trustee selected by the government and compensated by AT&T and Dobson to effectuate the divestitures.  The Final Judgement expires ten years from the date of its entry, unless extended by order of the Court.

Pursuant to the requirements of the Tunney Act, the government published the proposed Final Judgment and the CIS in the *Federal Register* on November 19, 2007, *see* 72 Fed. Reg. 65,060 (2007), and published a summary of their terms, together with directions for submitting written comments, in the *Washington Post* for seven days beginning on November 18, 2007, and ending on November 24, 2007.  (Pl.'s Mot. at 3.)  The 60-day period for public comments ended on January 22, 2008.  (*Id.*)  One comment was submitted by Mid-Tex Cellular, Ltd. ("Mid-Tex"), a company in which AT&T has a minority interest, which competes with the merging firms in some markets.  The government filed its response to the comment with this Court and published both the comment and its response in the *Federal Register* on March 13, 2008.  *See* 73 Fed. Reg. 13,570 (2008).  The government now moves for entry of the Final Judgment.

## ANALYSIS

**I.     Standard of Review**

Before approving a consent judgment, the Court must decide whether the proposed final judgment is "in the public interest."  15 U.S.C. §16(e)(1).[2]  This inquiry must be informed by

---

[2] "[T]he procedure for making the public interest determination is generally left to the discretion of the Court."  *United States v. SBC Commc'ns, Inc.*, 489 F.Supp. 2d 1, 10 (D.D.C. 2007) (citing 15 U.S.C. § 16(f)).  The "Court is not required to conduct an evidentiary hearing nor is it required to permit anyone to intervene."  *Id.* (citing 15 U.S.C. § 16(e)(2)).  The "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement alone."  *United States v. Enova Corp.*, 107 F.Supp.2d 10, 17 (D.D.C. 2000).

consideration of the factors enumerated in the statute, which require the Court to evaluate both "the competitive impact of the proposed remedies, *i.e.*, how well the settlement remedies the harms alleged in the complaint[]," as well as "issues unrelated to the competitive impact of the settlement." *SBC Commc'ns, Inc.*, 489 F.Supp.2d at 17.  See 15 U.S.C. § 16(e)(1)(A) & (B) (listing factors).[3]

In making its determination the Court may not simply "rubberstamp" the government's proposal, but rather it must engage in an "'independent' determination of whether a proposed settlement is in the public interest." *Id.* at 15 (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1458 (D.C. Cir. 1995)).  However, the Court must also take into consideration that the government is entitled to "broad discretion to settle with the the defendant within the reaches of the public interest." *Microsoft Corp.*, 56 F.3d at 1461.  "[A] district court is not permitted to reject the proposed remedies merely because the court believes other remedies are preferable," *SBC Commc'ns*, 489 F.Supp.2d at 15 (citation omitted), and "should be deferential to the government's predictions of the proposed remedies." *Id.   See also United States v. Tel & Tel. Co.*, 552 F.Supp.

---

[3] 15 U.S.C. § 16(e)(1)(A) & (B) provide that in making the "public interest" determination, the Court must consider

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of these issues at trial.

131, 151 (D.D.C. 1982) (internal quotation marks and citations omitted) ("[A] proposed consent decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is within the reaches of the public interest.")  In sum, "the relevant inquiry is whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlement are reasonable." *SBC Commc'ns*, 489 F.Supp.2d at 15-16, 17.

## II.     "Public Interest" Determination

Applying the statutory factors to the proposed Final Judgment, the Court concludes that it "falls within the range of acceptability" because it sufficiently minimizes the anti-competitive impact of AT&T's acquisition of Dobson.  This result is accomplished by requiring AT&T to divest itself of assets in those markets in which AT&T and Dobson collectively service a substantial majority of subscribers, either directly or indirectly.   There is a clear and logical relationship between the allegations set forth in the government's complaint and its proposed remedies.  The Final Judgment provides for a timeline and for an enforcement mechanism in the event that AT&T and Dobson fail to meet the mandated deadlines.   The Court therefore finds that the entry of the Final Judgment is within the public interest.

The limited objection filed during the public comment period does not dissuade the Court from this view.  In its comment, Mid-Tex first argues that the government should require AT&T to make additional divestitures in some parts of Texas RSA-9. (Comments of Mid-Tex Cellular Inc. ["Comment"] at 2-4.)  The government explains that it rejected this proposal because AT&T is not a strong competitor in all areas of Texas RSA-9, and in the small part where AT&T is strong, there are three other companies (Sprint, Verizon, and T-Mobile) offering wireless service. (Response to

Public Comments ["Response'] at 9-10.)   The government therefore did not believe it could successfully allege and prove that the combined businesses would be likely to reduce competition substantially.  (*Id.*)

While Mid-Tex might be correct that its proposed addition to the divestitures would make the Final Judgment more effective, it is not for the Court to determine "whether the proposed remedy is the best one, but only whether it is 'within the reaches of the public interest.'" *SBC Commc'ns*, 489 F.Supp.2d at 15 (quoting *Microsoft*, 56 F.3d at 1460) (internal quotation marks and citations omitted).   The Court is mindful that "a consent decree is the product of a negotiated settlement . . . ." *United States v. Archer-Daniels-Midland Co.*, 272 F.Supp. 1, 6 (D.D.C. 2003).  It must therefore defer to the government's determination that it could not prove an allegation that the combined businesses would pose a competitive risk in this area.  *See Microsoft*, 56 F.3d at 1458 ("Remedies which appear less than vigorous may well reflect an underlying weakness in the government's case, and for the district judge to assume that the allegations in the complaint have been formally made out is quite unwarranted.")

Mid-Tex next argues that AT&T should not be prohibited from reacquiring a non-controlling interest in Mid-Tex during ten-year term of the proposed Final Judgment.  (*See* Comment at 4.) It contends that if AT&T were to reacquire a passive, non-controlling interest in Med-Tex, it would not pose a threat to competition. (*Id.* at 4-5.)  The government responds that even a passive interest may have anticompetitive consequences and explains that a bright line prohibition will help ensure the success of the divestiture.  (*See* Response at 13.)   Again, the Court must "defer[] to the

government's predictions as to the effects of the proposed remedies."[4]  *SBC Commc'ns*, 489 F.Supp.2d at 15 (citation omitted).

## **CONCLUSION**

For the foregoing reasons, the Court concludes that the proposed Final Judgment is well "within the reaches of the public interest." *United States v. Western Electric Co.* 900 F.2d 283, 309 (D.C. Cir. 1990) (citation, internal quotation marks and emphasis omitted).  The government's Motion for Entry of Final Judgment is GRANTED and shall be entered by separate order.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

DATE:  March 20, 2008

---

[4] Finally, Mid-Tex argues in a footnote that if market conditions change, a reacquisition by AT&T would not necessarily limit competition.  (*See* Comment at 5 n. 11.)  Should this occur, appropriate steps may be taken to modify the reacquisition clause and thus the Court need not address this hypothetical.